UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
BRYAN FERNANDEZ et al.,                              :

                                                     :          OPINION AND ORDER
                        Plaintiffs,                             16 Civ. 2762 (GWG)
                                                     :

        -v.-                                         :

                                                     :

HR PARKING INC et al.,                               :

                        Defendants.                  :
-----------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

        Plaintiffs in this case are current and former employees of HR Parking Inc. ("HR

Parking"),[1] who have sued HR Parking and its owner, Nelson Rodriguez, along with three other

defendants: Open Road Audi of Manhattan ("Open Road," "Audi Manhattan," or "Audi"),

Michael Morais, and Rodman Ryan (collectively, the "Open Road Defendants"). Under both the

Fair Labor Standards Act, 29 U.S.C. §§ 201 et. seq. ("FLSA"), and the New York Labor Law

§§ 190 et seq. ("NYLL"), any employee who works more than forty hours per week must be

paid at a rate not less than 150% of the employee's regular hourly rate for all hours worked

beyond forty. 29 U.S.C. § 207(a)(1); N.Y. Comp. Codes R. & Regs. Tit. 12 § 142–2.2.

Plaintiffs here allege that the defendants violated this requirement when plaintiffs worked for

them as valets at Audi Manhattan.

        The Open Road Defendants now move for summary judgment on the issue of their status

as employers, whether plaintiffs are similarly situated, and whether plaintiffs can proceed as a

---

[1] HR Parking also is referred to as Tri-State Parking and Executive Parking. See
Memorandum in Support of First Motion for Summary Judgment, filed June 21, 2019 (Docket
# 95) ("Def. Mem.") at 1 n.1.

class.[2]  For the reasons stated below, Open Road Defendants' motion is denied.

I.    BACKGROUND

A.    Procedural Background

Plaintiff Bryan Fernandez filed the complaint in this action on April 13, 2016, claiming

HR Parking and the Open Road Defendants failed to pay him the proper overtime rate when he

worked more than 40 hours per week.  Complaint, filed April 13, 2016 (Docket # 1) ¶ 51.  Both

HR Parking and the Open Road Defendants answered and the Open Road Defendants asserted

cross-claims against HR Parking.  Answer to Complaint, filed June 22, 2016 (Docket # 24);

Answer to Complaint, Crossclaim, filed July 22, 2019 (Docket # 35).

On July 1, 2016, Fernandez moved for approval of the case as a collective action under

29 U.S.C. § 216(b).  See Motion to Conditionally Certify Collective Action, filed July 1, 2016

(Docket # 28); Affidavit of Bryan Fernandez in Support of Motion to Conditionally Certify

Collective Action, filed July 1, 2016 (Docket # 29); Memorandum of Law in Support of Motion

to Conditionally Certify, filed July 1, 2016 (Docket # 30).  The motion was granted as

unopposed.  See Order, filed Oct. 19, 2016 (Docket # 43); Order Conditionally Certifying

Collective Action, filed Nov. 17, 2016 (Docket # 47).

Carlos Arzeno, Naiim Flowers, Hernando Daza, Julio Diaz, and Candiany Rodriguez

_____

[2]  First Motion for Summary Judgment, filed June 21, 2019 (Docket # 93); Declaration of
Frank Keenan in Support of First Motion for Summary Judgment, filed June 21, 2019 (Docket #
94) ("Keenan Decl."); Def. Mem.; Memorandum of Law in Opposition to First Motion for
Summary Judgment, filed July 12, 2019 (Docket # 100) ("Pl. Mem."); Counter Statement, filed
July 12, 2019 (Docket # 101); Memorandum of Law in Opposition to First Motion for Summary
Judgment, filed July 12, 2019 (Docket # 102); Response in Opposition to Motion, filed July 12,
2019 (Docket # 103); Memorandum of Law in Support of First Motion for Summary Judgment,
filed July 24, 2019 (Docket # 104) ("Reply Mem."); Response in Opposition to Motion, filed
July 24, 2019 (Docket # 105); Rule 56.1 Statement, filed Sept. 6, 2019 (Docket # 106).

("Candiany") filed forms consenting to become party plaintiffs. (Docket ## 50–53, 57). The consent forms included a box allowing claimants to indicate that they worked at "Audi Manhattan" and thus that they were joining the lawsuit as against the Open Road Defendants. Diaz and Flowers did not check this box. (Docket ## 50, 53). Daza checked this box (Docket # 52) but conceded at his deposition that he never worked at Audi Manhattan. See Deposition of Hernando Daza, annexed as Exhibit D to Keenan Decl. ("Daza Dep.") at 23.

The Open Road Defendants filed the instant motion for summary judgment on June 21, 2019.

B. <u>Facts</u>

The following facts are either undisputed or constitute facts that have been advanced by plaintiffs and for which evidentiary support has been provided. We note additional relevant facts in our discussion of the employment issue. See Section III below.

Nelson Rodriguez ("Nelson") owns HR Parking, which provides valet services. Deposition of Julio Diaz, annexed as Exhibit C to Keenan Decl. ("Diaz Dep.") at 8, 30, 46. These services essentially consist of driving and otherwise servicing automobiles. See id. at 8. Each of the plaintiffs worked for HR Parking as a valet.[3] The Open Road Defendants entered into a contract with HR Parking to provide Open Road with valets, at the Audi Manhattan dealership. See Agreement with HR Parking DBA Tristate Parking, dated January 3, 2014, annexed as Exhibit G to Keenan Decl. ("Contract"). Fernandez, Candiany, and Arzeno

---

[3] See Deposition of Bryan Fernandez, annexed as Exhibit B to Keenan Decl. ("Fernandez Dep.") at 12, 14, 24–26, 31, 44; Diaz Dep. at 7, 11; Daza Dep. at 20; Deposition of Candiany Rodriguez, annexed as Exhibit E to Keenan Decl. ("Candiany Dep.") at 19; Affidavit of Carlos Arzeno in Opposition to Summary Judgment, filed July 12, 2019 (Docket # 99) ("Arzeno Aff.") ¶ 5; Consent to Become a Party Plaintiff Under F.L.S.A., filed Dec. 29, 2016 (Docket # 51).

(henceforth, the "plaintiffs") were valets who worked at Audi Manhattan. Fernandez Dep. at

30–31, 33, 44; Candiany Dep. at 19; Arzeno Aff. ¶¶ 2, 5.[4] Daniel Fernandez ("Daniel") was a

valet supervisor that Nelson employed to be in charge of the valets at Audi Manhattan.

Fernandez Dep. at 42. Eliana Giraldo was an employee of Open Road Defendants who

interacted with the valets, as is described further below. Fernandez Dep. at 30; Candiany Dep. at

61–62; Arzeno Aff. ¶¶ 13, 16–20.

Nelson gave the valets that worked at Audi Manhattan clothing that said "Audi."  See

Fernandez Dep. at 99–100; Candiany Dep. at 48–50; Arzeno Aff. ¶ 11. The Open Road

Defendants wanted such clothing worn when the valets were on the premises. See Fernandez

Dep. at 99–100, 190–91 (describing the clothing as a "uniform"); Candiany Dep. at 48–50

("something that they wanted you to wear everyday"); Def. Mem. at 10 ("Audi of Manhattan did

ask that while Tri-State employees are on the premises that they wear shirts and items bearing

the Open Road logo."). Fernandez was also given additional shirts by Giraldo. Fernandez Dep.

---

[4] The Open Road Defendants argue that we should disregard the Arzeno affidavit on the
ground that it is "self-serving." Reply Mem. at 4. This argument is rejected. The testimony of a
party to a proceeding is usually "self-serving" and a court may not disregard such testimony
simply on this basis. See Dye v. Kopiec, 2016 WL 7351810, at *3 (S.D.N.Y. Dec. 16, 2016)
("Even a self-serving affidavit can establish a genuine dispute of fact so long as the affidavit
does not contradict the witness's prior testimony.") (citing Hayes v. N.Y.C. Dep't of
Corrections, 84 F.3d 614, 619 (2d Cir. 1996); accord Widmar v. Sun Chem. Corp., 772 F.3d 457,
460, n.1 (7th Cir. 2014) ("[A] self-serving affidavit is an acceptable method for a non-moving
party to present evidence of disputed material facts." (citation omitted)); see also C.R. Pittman
Constr. Co. v. Nat'l Fire Ins. Co. of Hartford, 453 F. App'x 439, 443 (5th Cir. 2011) ("A party's
own testimony is often 'self-serving,' but we do not exclude it as incompetent for that reason
alone."). The Court does, however, disregard any statement in that affidavit made by an
unidentified person named "Max" inasmuch plaintiffs have not demonstrated why Max's
statements are not hearsay.

The Open Road Defendants also argue that, because Arzeno was not deposed, his claims
should be dismissed. Def. Mem. at 27. This argument is rejected because the defendants
provide no argument and cite no facts that would justify dismissing Arzeno as a party.

at 191.  Audi gave the valets walky-talkies.  Arzeno Aff. ¶ 14.

Valet duties typically included driving customer cars between the ground level where clients could pick up and drop off cars and the service center on the sixth floor.  Fernandez Dep. at 52–53; Candiany Dep. at 33; Arzeno Aff. ¶ 22.  Fernandez described his day as follows:

> We would receive the clients coming in, the customers, ask them their name and if they had an appointment, get the appointment and then start bringing the cars up to sixth floor. So we had to take all the cars up to the roof. And then basically whenever they need a car, to go to the mechanic. Certain days we would bring the cars down. We were constantly moving the cars up and down in the building.

Fernandez Dep. at 52–53.

Valets would sometimes service the showroom instead of the service center.  In the showroom, he would prepare cars for sale.  Fernandez Dep. at 88.  Fernandez described his work in the showroom as follows:

> So, if I worked in the showroom I had to prep the cars, how they call it -- the delivery cars which are the cars that were sold. They would give me a list. Let's say, today there is eight cars that are sold, we need to prep the cars. The customers are coming to get the cars to pick up. So they gave me a guest car. I had to gas the car up. I had to take it to the wash. I had to inspect the car. I had to make sure the car was complete ready to be picked up, new cars.

Fernandez Dep. at 55.  Valets would also drive cars around to add miles so that the car could pass inspection or add gas to a vehicle off-site.  Candiany Dep. at 33.  Valets were occasionally asked to perform other tasks at Audi Manhattan, such as shoveling snow, Fernandez Dep. at 61–63, 81–82; moving boxes, id. at 87–89; and covering the seats on the vehicles, Arzeno Aff. ¶ 22.  Valets could also be sent to other dealerships — and sometimes out of state — to pick up cars, though there is no indication that this occurred frequently.  See Fernandez Dep. at 55–57; Candiany Dep. at 34 (trips off premises occurred "not many times."), 35 ("Under ten" such trips in two years); Arzeno Aff. ¶ 22.

The plaintiffs' usual hours were from 7:00 a.m. to 7:00 p.m., Monday through Friday, totaling 60 hours per week. Fernandez Dep. at 34; Candiany Dep. at 19; Arzeno Aff. ¶ 4. Their regular rate of pay varied between $8.50 and $10.00 per hour. Fernandez Dep. at 36–37; Candiany Dep. at 26; Arzeno Aff. ¶ 6. None of them was ever paid a higher rate for their overtime hours. Fernandez Dep. at 66–67, 164; Candiany Dep. at 39; Arzeno Aff. ¶ 8.

II.    GOVERNING LAW

A.    The Standard for Summary Judgment

Rule 56(a) of the Federal Rules of Civil Procedure provides that a court shall grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, "[t]he evidence of the non-movant is to be believed" and the court must draw "all justifiable inferences" in favor of the nonmoving party. Id. at 255 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)); accord Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001) ("[A]ll reasonable inferences must be drawn against the party whose motion is under consideration.").

Once the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial,'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis in original), and "may not rely on conclusory allegations or unsubstantiated speculation," Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998) (citing cases). In other words, the nonmovant must

6

offer "concrete evidence from which a reasonable juror could return a verdict in his favor."

Anderson, 477 U.S. at 256. Where "the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to its case." Nebraska v. Wyoming, 507 U.S. 584, 590 (1993) (internal quotation marks and citation omitted). Thus, "[a] defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case." Allen v. Cuomo, 100 F.3d 253, 258 (2d Cir. 1996) (citing Anderson, 477 U.S. at 247–48).

B.     "Employer" under the FLSA

The FLSA imposes liability on the "employer" of any person who violates the FLSA's minimum wage, overtime, and retaliation provisions. See 29 U.S.C. §§ 216(b), (e)(2). The FLSA defines "employer" as an entity "acting directly or indirectly in the interest of an employer in relation to an employee . . . ." 29 U.S.C. § 203(d). It includes "an individual, partnership, association, corporation, business trust, legal representative, or any organized group of persons." See 29 U.S.C. §§ 203(a), (d).

The Second Circuit has held that an employment relationship exists under the FLSA when the "economic reality" is such that the "alleged employer possessed the power to control the workers in question." Herman v. RSR Sec. Servs. Ltd., 172 F.3d 132, 139 (2d Cir. 1999) (citing Carter v. Dutchess Cmty. Coll., 735 F.2d 8, 12 (2d Cir. 1984)). An entity need not possess "formal control" over a worker to qualify as an employer; rather, the entity may simply exercise "functional control" over the worker. Zheng v. Liberty Apparel Co., 355 F.3d 61, 72 (2d Cir. 2003). Additionally, a worker performing a task may simultaneously do so on behalf of more than one "joint employers." 29 C.F.R. § 791.2; Zheng, 355 F.3d at 66 (citing 29 C.F.R.

§ 791.2). When two or more entities operate as joint employers of a given worker, each employer is jointly and severally liable for the FLSA violations of all other joint employers. See Ansoumana v. Gristede's Operating Corp., 255 F. Supp. 2d 184, 196 (S.D.N.Y. 2003) ("Both Duane Reade and the Hudson/Chelsea defendants were the 'employers' of the plaintiffs under [the FLSA and the NYLL], [and are] jointly and severally obligated for underpayments of minimum wage and overtime . . . ."); 29 C.F.R. §§ 791.2(a)–(b). A joint employment relationship does not exist if the alleged joint employers "are acting entirely independently of each other and are completely disassociated with respect to the employment of a particular employee." Id. at § 791.2(a).

The Second Circuit has developed three tests for determining whether a person or entity is an employer, including a joint employer. See Greenawalt v. AT& T Mobility LLC, 642 F. App'x 36, 37 (2d Cir. 2016) (citing Barfield v. N.Y.C. Health & Hosps. Corp., 537 F.3d 132, 142–43 (2d Cir. 2008)). The first test was articulated in Carter v. Dutchess Cmty. Coll., 735 F.2d 8, 12 (2d Cir. 1984), and looks to whether an employer exercised "formal control" over a worker. Under this test, a court considers whether an entity: "(1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." Id. at 12 (citation omitted). "[W]hen an entity exercises those four prerogatives, that entity, in addition to any primary employer, must be considered a joint employer." Zheng, 355 F.3d at 67.

A second test, articulated in Brock v. Superior Care, Inc., 840 F.2d 1054, 1059 (2d Cir. 1988), is "more relevant for distinguishing between independent contractors and employees," Valez v. Sanchez, 693 F.3d 308, 326 (2d Cir. 2012), because the focus is on whether "the

8

workers depend upon someone else's business . . . or are in the business for themselves," Brock, 840 F.2d at 1059. That test does not apply here.

The third test, outlined in Zheng v. Liberty Apparel Co., 355 F.3d 61, 72–76 (2d Cir. 2003), weighs six "nonexclusive and overlapping" factors to determine if a employer had "functional control" over workers. Case law has recognized that the Zheng factors "are most relevant in the context of subcontractor relationships." Granda v. Trujillo, 2019 WL 367983, at *5 (S.D.N.Y. Jan. 30, 2019). Zheng involved a garment manufacturer who contracted with other entities to have workers stitch and finish pieces of clothing. Zheng, 355 F.3d at 63. To determine whether the manufacturer was a joint employer with the contractors, the Zheng court looked to:

> (1) whether [the manufacturer]'s premises and equipment were used for the plaintiffs' work; (2) whether the Contractor Corporations had a business that could or did shift as a unit from one putative joint employer to another; (3) the extent to which plaintiffs performed a discrete line-job that was integral to [the manufacturer]'s process of production; (4) whether responsibility under the contracts could pass from one subcontractor to another without material changes; (5) the degree to which the [the manufacturer] or their agents supervised plaintiffs' work; and (6) whether plaintiffs worked exclusively or predominantly for the [the manufacturer].

Zheng, 355 F.3d at 72. Zheng makes clear that not every factor needs to weigh against joint employment in order for a defendant to be entitled to summary judgment. Id. at 77.[5]

C.  "Employ[er]" under the NYLL

The NYLL's definition of employment is nearly identical to the FLSA's. Compare 29

---

[5] In addition to these tests, courts have used the "single integrated enterprise" or "single employer" doctrine to determine whether it should "treat a group of distinct but closely affiliated entities as a single employer for FLSA purposes." Hernandez v. Delta Deli Mkt. Inc., 2019 WL 643735, at *3 (E.D.N.Y. Feb. 12, 2019). Because there is no allegation of any connection between the Open Road Defendants and HR Parking, we do not consider that doctrine here.

U.S.C. § 203(g) ("'Employ' includes to suffer or permit to work."), with N.Y. Lab. Law § 2(7) ("'Employed' includes 'permitted or suffered to work.'").   As a result, courts in this circuit "hold that the New York Labor Law embodies the same standards for joint employment as the FLSA." Chen v. St. Beat Sportswear, Inc., 364 F. Supp. 2d 269, 278 (E.D.N.Y. 2005) (citing cases); accord Spicer v. Pier Sixty LLC, 269 F.R.D. 321, 335 n.13 (S.D.N.Y. 2010) ("[C]ourts have interpreted the definition of 'employer' under the New York Labor Law coextensively with the definition used by the FLSA.") (citation omitted); Ansoumana, 255 F. Supp. 2d at 189 ("Because New York Labor Law and the FLSA embody similar standards . . . I will consider the federal law in deciding whether defendants were joint employers.") (citing cases); see also Garcia v. La Revise Assocs. LLC, 2011 WL 135009, at *5 (S.D.N.Y. Jan. 13, 2011) ("New York's 'employer' provisions are equally [as] broad [as the FLSA's]." (citing Spicer, 269 F.R.D. at 335 n.13)).

Accordingly, this Court's conclusions with respect to the defendants' status as employers under the FLSA apply equally to the defendants' status as employers under the NYLL.

III.  WHETHER THE OPEN ROAD DEFENDANTS WERE EMPLOYERS

A. Formal Control

We begin by examining the four "formal control" factors under Carter.

1.  Whether the Open Road Defendants Had the Power to Hire and Fire

The first factor is whether Open Road Defendants had the ability to hire and fire valets. See Carter, 735 F.2d at 12.  As to hiring, the plaintiffs submit evidence only that Girardo could request that valets be hired.  See, e.g., Arzeno Aff. ¶¶ 2, 15.  There is no evidence, however, that the Open Road Defendants' accepted or reviewed applications for the valet positions or made the final decisions that an applicant should be hired.  Mere influence on hiring is not sufficient to

find that this factor has been met.  See Jean-Louis v. Metro. Cable Commc'ns, Inc., 838 F. Supp.

2d 111, 123 (S.D.N.Y. 2011) (no power to hire despite requiring background checks).

As to firing, the question is whether the Open Road Defendants could terminate the

valet's employment with HR Parking, not at Audi Manhattan.  While it is not strong, the

plaintiffs have submitted evidence that would allow a reasonable jury to conclude that the Open

Road Defendants had some ability to fire valets from their work at HR Parking.  Both Fernandez

and Arzeno assert that they were effectively fired by Giraldo inasmuch as she told them to leave

and they then stopped working for both Open Road Defendants and HR Parking.  Fernandez

Dep. at 30, 61–65; Arzeno Aff. ¶ 13.  Nelson specifically told Fernandez that it was Giraldo, not

he or HR Parking, who fired him.  Fernandez Dep. at 65.  Candiany also believed Giraldo could

fire valets, Candiany Dep. at 64, and witnessed Giraldo fire a valet, although Candiany did not

know if the valet was an employee of HR Parking, id. at 141–42.

Accordingly, according plaintiffs all reasonable inferences, this first factor partially

supports a finding of joint employment, although the evidence is not strong.

### 2. Whether the Open Road Defendants Supervised and Controlled Employee Work Schedules or Conditions of Employment

The more supervision and control an entity exercises, the more likely it is an employer.

Zheng, 355 F.3d at 74–75.  But "the law does not require an employer 'to look over his workers'

shoulders every day in order to exercise control."  Barfield, 537 F.3d at 147 (quoting Brock v.

Superior Care, Inc., 840 F.2d 1054, 1060 (2d Cir. 1988)).  "[J]oint employer status may be found

even where control is exercised only occasionally."  Vasto v. Credico (USA) LLC, 2017 WL

4877424, at *9 (S.D.N.Y. Oct. 27, 2017) (internal quotation marks and citations omitted), aff'd,

767 F. App'x 54 (2d Cir. 2019).  The parties dispute how much control Open Road Defendants

had over plaintiffs.  But accepting plaintiffs' testimony as true, and according them all reasonable inferences in their favor, a jury could find that while the Open Road Defendants exercised little or no supervision over specific employee schedules, they exercised significant supervision over the conditions of employment.

As to schedules, the evidence most favorable to the plaintiffs is the fact that the contract between HR Parking and Open Road Defendants states "Schedules and time are to be provided by management."  Contract at *2.[6]  Nonetheless, there is no evidence that the Open Road Defendants actually provided schedules that individual employees were to follow.  At least one plaintiff testified that Nelson (that is, HR Parking's owner) gave him his schedule.  Candiany Dep. at 24–25.  Nelson also handled any issues involving time off or pay.  See Fernandez Dep. at 45, 68; Candiany Dep. at 45–46, 52, 66, 119–120.  On rare occasions, Giraldo directed that a valet should deviate from that schedule.  Candiany Dep. at 89–90; Arzeno Aff. ¶¶ 17–18.

The valets used a time clock and punch cards, both of which were located at Audi Manhattan.  See Fernandez Dep. at 38–40; Candiany Dep. at 37–38; Arzeno Aff. ¶ 21.  No one watched them punch in or out.  Fernandez Dep. at 37–38.  Other valet sites operated by HR Parking did not have a time clock.  See Fernandez Dep. at 13, 16–17, 19–20; Candiany Dep. at 41; Diaz Dep. at 24, 49.  Fernandez reviewed his punch card for accuracy at the end of the day and would correct errors, and other valets also followed this procedure.  Fernandez Dep. at 131–32.  At most, there is evidence that Giraldo would review the timecards to see if valets were

---

[6] Page numbers identified by "*__" refer to the pagination assigned by the Court's ECF system.

coming in late.  Arzeno Aff. ¶ 20.[7]  The requirement to punch in and out every day was not

supervised by anyone from Audi Manhattan.  Fernandez Dep at 119.  Thus, there is no evidence

to support the notion that Open Road Defendants set the valet's specific schedules.

With respect to the supervision of the valet's actual duties on a day to day basis,

defendants concede that managers at Audi of Manhattan "direct[ed] valets to move cars, or get

cars for technicians."  Def. Mem. at 10; accord Def. Mem. at 19 (Audi "directed Tri-State's

employees with respect to which cars to move and where they were going. . . . ").  Fernandez

testified that Daniel acted as a "manager" of the valets.  Fernandez Dep. at 43.  Nelson appears

to have hired him to act as "manager" of the valets, although Daniel himself did valet duties.  Id.

at 43–44.  Daniel was apparently an employee of HR Parking.  Id. at 43.  Fernandez testified that

he was supervised either by Nelson or Daniel, id. at 80–81, but that he was also supervised by

"managers at Audi," id. at 81–83.[8]

There were three such managers in the sales department.  Id. at 82.  The only manager in

the service department who supervised the valets was "Iliana [Giraldo]."  Id. at 82–83.  As for

Giraldo, Fernandez testified she would "supervise everything."  Id. at 83.  As he put it, Giraldo

would instruct the workers "[w]here to be at the dealership, what to do, some of the guys to go

up to this floor or that floor. Sometimes she would directly call and ask for a car, could you bring

---

[7]   We do not consider testimony from Fernandez that Giraldo was involved in approving changes to time cards because it is based on hearsay, see Fernandez Dep. at 132, or on testimony regarding a signature that is without foundation, id. at 136.

[8]  The fact that Nelson and Daniel engaged in supervision is not the end of the inquiry. As the Second Circuit noted in Barfield, "[t]he fact that the [subcontracting] agencies themselves may have exercised 'ultimate' authority in these areas does not alter the fact that [the putative employer] also exercised some authority which helps establish the economic reality of its status as a joint employer."  Barfield, 537 F.3d at 144 (emphasis added).

this car down." Fernandez Dep. at 83. In fact, she "supervised the day-to-day operation of the valet" and Fernandez considered her to be his "boss." Id. at 84. In other words both "Daniel and Iliana" supervised him during the day at the service department. Id. at 86.

Additionally, Giraldo (1) would discipline valets for being late, Arzeno Aff. ¶ 20; (2) direct valets to go to other dealerships to pick up cars, Candiany Dep. at 62; Arzeno Aff. ¶¶ 19, 22; (3) request valets work special events, Candiany Dep. at 89; Arzeno Aff. ¶ 18; and (4) direct valets whether to be in the showroom or working service, Fernandez Dep. at 51; Arzeno Aff. ¶ 17. While it is not of great significance, on one occasion Giraldo directed Fernandez to perform a non-valet duty: specifically, shoveling snow. Fernandez Dep. at 62. On one or more occasions Giraldo also sent valets home, including Fernandez and Arzeno. Fernandez Dep. at 62, 64; Arzeno Aff. ¶ 13.

Fernandez also testified that other managers for Open Road Defendants supervised him. One would "direct [him] within the dealership. . . . mak[ing] sure you do this and that, this way that way. Could you bring me this box, could you do this, could you do that." Fernandez Dep. at 87. Others directed him to go out of state to pick up cars, id. at 56, 85, or how to "prep" a car, id. at 90. This was different from other valet jobs where the person "running the location" was "just another employee, another valet." Candiany Dep. at 29–30.

Furthermore, plaintiffs were required to wear clothing bearing the logo of Open Road Defendants, see Fernandez Dep. at 99–100; Candiany Dep. at 48–50; Arzeno Aff. ¶ 11, although it appears that the uniforms were provided by HR Parking, see Fernandez Dep. at 99–100, 191; Candiany Dep. at 48–50; Arzeno Aff. ¶ 11.

The Open Road Defendants argue that because being directed and supervised was a necessary part of plaintiffs' jobs, this factor should not weigh in favor of finding joint

employment.  See Reply Mem. at 10.   However, the fact that the supervision was necessary does not render this factor any less important for the "economic reality" analysis.  For example, in Barfield, a hospital was required by law to supervise nurses yet Barfield found that the hospital's supervision still weighed in favor of joint employment.  Barfield, 537 F.3d at 147.

Citing Zheng, 355 F.3d at 75, the Open Road Defendants argue they only "supervised with respect to contractual warranties of quality and time of delivery."  Def. Mem. at 18.  Defendants' reference is to a portion of Zheng that distinguished between supervision where there is "effective control of the terms and conditions of the plaintiff's employment" and supervision of a "typical, legitimate" subcontract to make sure the terms in the subcontract relating to "quality" and "time of delivery" were adhered to.  Zheng, 355 F.3d at 75.  This distinction does not apply here, however, because the Open Road Defendants point to nothing in their contract with HR Parking relating to "quality" or "time of delivery."  Indeed, the services to be provided under the contract are described only by two words: "valet parking."  Contract at *2.  The situation here is thus a far cry from Moreau v. Air France, 343 F.3d 1179 (9th Cir. 2003) superceded by 356 F.3d 942 (9th Cir. 2004), a case cited in the relevant portion of Zheng, where an airline required the subcontracted ground crew to adhere to specific safety requirements.  See id. at 1188.

In sum, this factor weighs to some degree in favor of finding joint employment.

### 3.  Whether the Open Road Defendants Determined the Rate and Method of Payment

Carter asks whether the putative employer "determined the rate and method of pay for" the workers.  Carter, 735 F.2d at 12.  Here, Nelson signed the checks and addressed any issues

regarding pay.  Fernandez Dep. at 66–67; Candiany Dep. at 28, 29, 46.[9]  The checks originated

from HR Parking, though one plaintiff testified that Audi sometimes physically handed out the

checks.  Candiany Dep. at 28–29; but see Fernandez Dep. at 44 (paychecks were delivered to the

workers by Daniel).

　　　An inference that the Open Road Defendants had some control over the method of

payment may be drawn from the fact that at other valet jobs, the plaintiffs were paid in cash on a

by-shift basis.  Fernandez Dep. at 22–25, 27, 35, 111; Candiany Dep. at 26–30; Arzeno Aff. ¶ 7.

When they worked at Audi, however, they were paid on an hourly basis and via check.

Fernandez Dep. at 33, 41–42, 117; Candiany Dep. at 26, 28–29; Arzeno Aff. ¶ 7.  Special events

worked for the Open Road Defendants would be recorded on the timecard and paid via check.

Candiany Dep. at 97–98.  This suggests Open Road Defendants did had some control over the

method of payment.

　　　As for the rate of payment, the contract between Open Road Defendants and HR Parking

provided that Audi would pay $14.75 per hour for each attendant.  See Contract at *2.

Defendants argue that this does not show any control over the rate of pay since HR Parking was

free to pay plaintiffs any amount they wanted.  Def. Mem. at 11–12; Reply Mem. at 1–2.

Plaintiffs argue that this effectively set a cap on the amount Open Road Defendants could pay

the valets.  Pl. Mem. at 26–27.

　　　The plaintiffs' argument finds support in Barfield, where the employer paid a "flat" rate

per hour to the contract for each hour of labor.  Barfield, 537 F.3d at 136.  The Second Circuit

_____

　　　[9]  For the same reasons outlined above in footnote 7, we do not consider Fernandez's
testimony regarding Giraldo's involvement in approving time-card changes.  See Fernandez
Dep. at 132, 136.

found that as a result of this arrangement, the employer "exerted some control" over the hourly rate paid to the worker.  Id. at 144.  As a result, Barfield, found this Carter factor to be "inconclusive."  Id.  We reach the same conclusion.

### 4. Whether the Open Road Defendants Maintained Employment Records

The final Carter factor is whether defendants maintained the workers' employment records.  Carter, 735 F.2d at 12.  As already noted, there were punch cards on the Audi premises that were used by the plaintiffs.  See Fernandez Dep. at 38–39; Candiany Dep. at 37–38; Arzeno Aff. ¶ 21.  While there was testimony from the plaintiffs that Giraldo sometimes looked at the time-cards, Fernandez Dep. at 132–34; Arzeno Aff. ¶ 20, there is no competent evidence that the punch cards were "maintained" by Audi as opposed to Nelson and Daniel, the representatives from HR Parking.  Also, while the Open Road Defendants handed out the paychecks, Candiany Dep. 28–29, there was no evidence they "maintained" them.

As plaintiffs point out, Pl. Mem. at 29, the Open Road Defendants necessarily received bills from HR Parking that contained the total number of hours valets worked.  But there is no competent evidence that any of the bills broke down workers' hours or rates that they were actually paid.  Nor is there any evidence that the Open Road Defendants ever "maintained" those records in any meaningful sense of the word.  Thus, this is not a case such as Barfield, where the employer "sign[ed] off on" the time-card, "verif[ied] the number of hours worked," and "then provide[d] records" to the contractor.  537 F.3d at 136.  Thus, this factor favors the defendants.

*     *     *

In the end, some of the factors favor a finding that the Open Road Defendants were employers and at least one does not.  Satisfying the four Carter factors "may be sufficient to establish joint employment under the FLSA [but] it is not necessary to establish joint

employment." Zheng, 355 F3d. at 79; accord Greenawalt, 642 F. App'x at 37 ("satisfying [the formal control] test is sufficient, but not necessary, to show joint employment."). Rather than determine, however, whether plaintiffs have supplied enough evidence to allow a jury to find formal control under Carter, we will instead turn to the Zheng "functional control" test, which allows a more expansive determination of employer status. In assessing "functional control," we will also consider any non-duplicative Carter factors in addition to the six Zheng factors.

### B. Functional Control

To determine whether plaintiffs can show "functional control" by the Open Road Defendants, we examine the six Zheng factors.

#### 1. Use of Audi Manhattan Premises and Equipment

The first Zheng factor, use of premises and equipment, 355 F.3d at 72, weighs in favor of finding Open Road Defendants are joint employers. "[W]hether a putative joint employer's premises and equipment are used by its putative joint employees [] is relevant because the shared use of premises and equipment may support the inference that a putative joint employer has functional control over the plaintiffs' work." Zheng, 355 F.3d at 72. "Although . . . shared premises . . . is [not] anything close to a perfect proxy for joint employment (because they are . . . perfectly consistent with a legitimate subcontracting relationship), the factfinder can use these readily verifiable facts as a starting point in uncovering the economic realities of a business relationship." Id.

Fernandez, Candiany, and Arzeno all worked at Audi Manhattan, the Open Road Defendants' premises. Fernandez Dep. at 30–33, 45; Candiany Dep. at 19; Arzeno Aff. ¶¶ 3–6. Indeed, it would be impossible for the valets to do their job if they were not regularly at those premises. They also wore Audi Manhattan clothing. Fernandez Dep. at 99–100; Candiany Dep.

18

at 48–50; Arzeno Aff. ¶¶ 11. Therefore, this factor weighs in favor of finding joint employment.

2. Shifting as a unit

The next functional control factor inquires whether HR Parking "had a business that could or did shift as a unit from one putative joint employer to another." Zheng, 355 F.3d at 72. This factor "is relevant because a subcontractor that seeks business from a variety of contractors is less likely to be part of a subterfuge arrangement than a subcontractor that serves a single client." Zheng, 355 F.3d at 72; accord Martin v. Sprint United Mgt. Co., 273 F. Supp. 3d 404, 430 (S.D.N.Y. 2017). Thus, when a contractor, like HR Parking, can shift its employees from one employer to another, this factor weighs against joint employment. Cf. Greenawalt, 642 F. App'x at 38 (citing Zheng, 355 F.3d at 72).

This factor weighs in favor of defendants. All of the plaintiffs testified that HR Parking serviced other locations. Fernandez Dep. at 12–27, 44–45; Candiany Dep. at 66; Arzeno Aff. ¶ 7. Indeed, Fernandez testified that he, and other valets, were shifted from job to job, including following the time that HR Parking contracted with Open Road Defendants. Fernandez Dep. at 12, 30–32. Thus, this is not a situation similar to what occurred in Greenawalt, where the contractor "existed only to serve" the employer. 642 F. App'x at 38.

Plaintiffs argue that "[i]t is entirely reasonable to infer that the Open Road Defendants would not allow ad hoc substitution and switching of their valets . . . especially considering Ms. Giraldo would request good workers . . . and re-hired ones she liked." Pl. Mem. at 31 (citing Arzeno Aff. ¶¶ 2, 15). Any such inference, however, would be speculative. The Contract here gives no authority to the Open Road Defendants to select employees and, although there is evidence that occasional preferences were stated by management, a reasonable jury could not find that HR Parking was prevented from moving workers from Audi Manhattan to any of the

other locations it serviced.  This situation is thus far different from <u>Barfield</u>, where the putative employer hospital sought to have the same workers regularly assigned to it "in order to promote more continuity of care."  537 F.3d at 138 (citation omitted).

Accordingly, this factor weighs against finding a joint employment relationship.

### 3.  Discrete Line-Job Integral to the Business

The third functional control factor examines "the extent to which plaintiffs performed a discrete line-job that was integral to [the purported joint employer's] process of production." <u>Zheng</u>, 355 F.3d at 72.  "Interpreted broadly, this factor could be said to be implicated in <u>every</u> subcontracting relationship, because all subcontractors perform a function that a general contractor deems 'integral' to a product or service."  <u>Zheng</u>, 355 F.3d at 73 (emphasis in original).  Accordingly, this factor is examined on a spectrum:

> [o]n one end of the spectrum lies . . . piecework on a producer's premises that requires minimal training or equipment, and . . . [o]n the other end of the spectrum lies work that is not part of an integrated production unit, that is not performed on a predictable schedule, and that requires specialized skills or expensive technology.

<u>Zheng</u>, 355 F.3d at 73.

Some courts "have questioned whether this factor translates well outside of the production line employment situation."  <u>Godlewska</u>, 916 F. Supp. 2d at 263 (internal punctuation altered); <u>see</u> <u>Jean–Louis</u>, 838 F. Supp. 2d at 134 ("[T]he third factor might apply with somewhat less vigor where, as here, the parties are engaged in providing a service rather than manufacturing a product").  Nonetheless, this factor should not be ignored here given that it has been applied by courts, including the Second Circuit, outside the production line context.  <u>See</u>, <u>e.g.</u>, <u>Greenawalt</u>, 642 F. App'x at 39 (security guards); <u>Vasto</u>, 2017 WL 4877424, at *14 ("field agents" doing outreach to low income individuals soliciting applications for a benefit program).

20

Here, the factor favors a finding of joint employment. This is not a situation where the defendants contracted out a job requiring "specialized skills," Zheng, 355 F.3d at 73, that was beyond the dealership's capability. Fernandez received no specialized training. Fernandez Dep. at 36–37. And the valets were "on a predictable schedule," Zheng, 355 F.3d at 73, inasmuch as there was a constant need for valets throughout the dealership's operations. The situation bears similarity to Barfield, where it was noted that the work of nurses at Bellevue Hospital involved "services performed on Bellevue's premises, using only Bellevue equipment." Barfield, 537 F.3d at 146. Finally, the work of the valets was "integral" to Audi Manhattan's operations as no rationale has been provided to explain how the servicing could have occurred without someone bringing the cars to the floor where the servicing took place.

In considering this factor, courts sometimes consult "industry custom and historical practice . . . insofar as the practice of using subcontractors to complete a particular task is widespread, it is unlikely to be a mere subterfuge to avoid complying with labor laws." Zheng, 355 F.3d at 73; see also, e.g., Vasto, 2017 WL 4877424, at *14 (noting that the job at issue was "commonly outsourced."). Given the absence of evidence regarding industry and historical practice for valets at car dealerships, and the absence of any explanation as to why the subcontracting arrangement was necessary, a jury could reasonably infer that in fact the employment of valets was not typically outsourced and thus that hiring a contractor to employ the valets might have been a subterfuge to avoid paying overtime. This inference is further buttressed by the fact that the contract with HR Parking provided for a flat rate per hour, see Contract at *2 — thus strongly incentivizing HR Parking to pay its workers a flat rate, rather than varying rates as required by the overtime laws.

The valets were obviously critical to the defendants business and there is no explanation

as to how the day-to-day operations could run without them.  Thus this case is unlike

Greenawalt, —  a case involving security guards at AT & T stores — where the court

specifically noted that  "the absence of guards at some AT & T stores" favored a finding that the

putative employer could function without them.  Greenawalt, 642 F. App'x at 39.

Accordingly, this factor weighs in favor of finding joint employment.

### 4.  Whether HR Parking's Contract Could Pass to Another Subcontractor

The fourth Zheng factor asks whether "responsibility under the contracts could pass from

one subcontractor to another without material changes."  355 F.3d at 74.  As one case has noted,

"[t]he fourth factor asks not whether all of the putative joint employer's contractors do the same

work but whether, if the putative joint employer hired one contractor rather than another, 'the

same employees would continue to do the same work in the same place.'"  Jean–Louis, 838 F.

Supp. 2d at 135 (quoting Zheng, 355 F.3d at 74) (emphasis in original).  This factor also raises

the "subterfuge" issue because

> when employees are tied to an entity . . . rather than to an ostensible direct
> employer such as the [contractor,] [i]n such circumstances, it is difficult not to
> draw the inference that a subterfuge arrangement exists. Where, on the other
> hand, employees work for an entity (the purported joint employer) only to the
> extent that their direct employer is hired by that entity, this factor does not in any
> way support the determination that a joint employment relationship exists.

Zheng, 355 F.3d at 74 (emphasis in original).

Here, Arzeno submitted an affidavit that he worked as a valet for the Open Road

Defendants under a previous contractor.  Arzeno Aff. ¶ 2.  When that contract ended, however,

he lost his job at Audi, see id., thus supporting the defendants' position as to this factor.  On the

other hand, another worker arranged to get him hired by HR Parking after a "brief period,"  id.,

which might support an inference that the Open Road Defendants sought to continue with the

same workers under the new contract.  Accordingly, we view this factor as potentially favoring the defendants but as ultimately inconclusive.

### 5.  Degree of Control and Supervision

"The inquiry under this factor is largely the same as the inquiry under the second formal control factor and is the most relevant factor in determining whether a purported joint employer exercises functional control over plaintiffs."  Martin, 273 F. Supp. 3d at 433 (citations, internal quotation marks, and alterations omitted).  As already discussed, this factor favors the plaintiffs.

### 6.  Exclusively or Predominantly Working for Open Road Defendants

The sixth Zheng factor asks whether the workers worked "exclusively or predominantly" for the putative joint employer.  355 F.3d at 72.  Here, the plaintiffs worked, at minimum, from seven in the morning until seven at night, Monday through Friday, for Open Road Defendants. Fernandez Dep. at 33–34; Candiany Dep. at 19; Arzeno Aff. ¶ 4.  All three also spent some time on Saturdays working as valets for Open Road Defendants, Fernandez Dep. at 34–35, 205–06; Candiany Dep. at 23, 123–25; Arzeno Aff. ¶ 4, and Candiany and Arzeno worked special events for Open Road Defendants, Candiany Dep. at 36, 139–40; Arzeno Aff. ¶ 18.  While all the plaintiffs testified to also working as valets for HR Parking at other locations on the weekends, Fernandez Dep. at 12–27, 44; Candiany Dep. at 66–67; Arzeno Aff. ¶ 7, they all consistently spent at least 60 hours a week working as valets for Open Road Defendants.  Thus plaintiffs essentially had full-time jobs working for Open Road Defendants.  Certainly, their work was "predominantly" for the Open Road Defendants.  Accordingly, this factor weighs in favor of the Open Road Defendants being deemed a joint employer.

### 7.  Summary

As the Second Circuit has stated, "the determination of whether an employer-employee

relationship exists for purposes of the FLSA should be grounded in economic reality rather than technical concepts, . . . determined by reference not to isolated factors, but rather upon the circumstances of the whole activity. Barfield, 537 F.3d at 141 (citations and internal quotation marks omitted). We must determine whether the "economic reality" is such that the "alleged employer possessed the power to control the workers in question." Herman, 172 F.3d at 139.

"The critical inquiry, in determining whether an employer-employee relationship exists, [is] the degree of control exercised by the purported employer over the results produced or the means used to achieve the results." Hart v. Rick's Cabaret Int'l, Inc., 967 F. Supp. 2d 901, 923 (S.D.N.Y. 2013) (citing Bynog v. Cipriani Grp., Inc., 1 N.Y.3d 193, 198 (2003)). An additional consideration is whether the employment arrangement reflects "a mere subterfuge to avoid complying with labor laws." Zheng, 355 F.3d at 73.

The question before us is whether the Open Road Defendants are entitled to summary judgment on this question — that is, whether we can conclude that no reasonable jury could find that they were joint employers of the plaintiffs. "Because determining joint employment is 'fact-intensive,' awards of summary judgment on this issue, although sometimes appropriate, are rare." Greenawalt, 642 F. App'x at 37.

To accomplish this goal, we consider, in addition to the six Zheng factors, the three non-duplicative Carter factors: that is, whether the defendants had the power to hire and fire, whether the defendants determined the rate and method of payment, and whether the defendants maintained employment records. As have already discussed, of these nine factors, a jury would be required to find that only two entirely favored defendants — that is, whether HR Parking had a business that could or did shift as a unit from one putative joint employer to another and whether the Open Road Defendants maintained employment records. The remaining factors

24

either favored plaintiffs or were inconclusive.

While it is not a question of numbers, the Second Circuit has upheld jury verdicts finding joint employment when "as many as three Zheng factors weighed against joint employment as a matter of law." Greenawalt, 642 F. App'x at 40 (citing Zheng v. Liberty Apparel Co., 389 F. App'x 63, 64 (2d Cir. 2010) ("Zheng II")). Here, only one Zheng factor and one Carter factor conclusively weigh against joint employment. As was the case in Greenawalt, "[i]t seems possible, then, that a reasonable jury could find . . . that [Open Road Defendants] was plaintiffs' joint employer." Greenawalt, 642 F. App'x at 40.

Zheng makes clear that a court may consider other appropriate factors. One overarching circumstance that counsels against an award of summary judgment is the fact that the Open Road Defendants were in a position to be aware of and prevent the violation of the overtime laws. As the Eleventh Circuit has noted, "a business that owns or controls the worksite will likely be able to prevent labor law violations, even if it delegates hiring and supervisory responsibilities to labor contractors." Layton v. DHL Exp. (USA), Inc., 686 F.3d 1172, 1180 (11th Cir. 2012). Here, the Contract allowed Open Road Defendants to set the workers' overall 7:00 a.m. to 7:00 p.m. 5-day a week schedules, the valets were on site every day and for the entire work period, and they punched a clock located at Audi Manhattan. Thus, the defendants had unmistakable knowledge of the fact that the valets were working 60 hours a week and would be entitled to overtime.

As for the defendants' knowledge of whether the valets were being properly paid overtime, there is evidence that the valets complained to Giraldo directly about the fact that they were not being paid overtime. See Fernandez Dep. at 180–81; Candiany Dep. at 45–46. Additionally, the defendants were on notice that New York State's minimum wage during part of

this period, starting on December 31, 2013, was $8.00 per hour, <u>see</u> New York State Department of Labor, <u>History of the General Hourly Minimum Wage in NY State</u>, https://labor.ny.gov/stats/minimum_wage.shtm, and thus the valets were entitled to an overtime rate of $12.00. Yet the defendants' contractual rate with HR Parking was for a fixed hourly rate of $14.75 per hour <u>regardless of whether the hour worked was "straight" time or overtime</u>. <u>See</u> Contract at *2. This provided a strong incentive to HR Parking to not pay the proper overtime rate. A jury could reasonably infer from these facts that the Open Road Defendants knew that the valets were not being paid overtime. Thus, this circumstance also counsels in favor of finding the Open Road Defendants to be joint employers.

After considering all the <u>Zheng</u> factors, the non-duplicative <u>Carter</u> factors, and the possibility that a jury could find that the defendants knew of the failure to pay overtime, we conclude that a reasonable jury could find that the Open Road Defendants were a joint employer of the plaintiffs.[10] Accordingly, defendants' motion for summary judgment is denied.

C.    <u>The Status of the Opt-in Plaintiffs</u>

In their motion for summary judgment, the Open Road Defendants include an argument that the plaintiffs who opted in as part of the collective action should be "decertified" or that Open Road Defendants should be dismissed, because the plaintiffs are not "similarly situated." Def. Mem. at 22. Open Road Defendants also argued that the plaintiffs failed to meet the Rule 23(a) requirements for a class action. <u>Id.</u> at 32. After the plaintiffs responded to these

_____

[10] We note that the Open Road Defendants have not made any arguments specific to the two individual Open Road Defendants: that is Michael Morais and Rodman Ryan. Instead, they made arguments as to all Open Road Defendants together. As a result, this Opinion and Order should not be construed as suggesting that there is sufficient evidence to allow a jury to find that Michael Morais and Rodman Ryan individually — separate from Open Road Audi of Manhattan — are employers under the FLSA or NYLL.

arguments in their opposition papers, the Open Road Defendants did not even address them in their reply brief.

Among plaintiffs' bases for opposing the defendants' arguments was the fact that the Open Road Defendants improperly raised these issues at all. Pl. Mem. at 41. Local Rule 7.1(a) mandates that all motions require "[a] notice of motion . . . specify[ing] the applicable rules or statutes pursuant to which the motion is brought, and shall specify the relief sought." Local Rule 7.1(a)(1). Open Road Defendants' notice of motion makes no reference to any motion other than the one for summary judgment under Fed. R. Civ. P. 56. First Motion for Summary Judgment, filed June 21, 2019 (Docket # 93). Additionally, their request for leave to file their motion for summary judgment raised only the issue of joint-employment. See Motion for Leave to File a Motion for Summary Judgment, filed May 17, 2019 (Docket # 88).

Notwithstanding these failures, the defendants' request is denied.

The request for "decertification" refers to the two-step process approved by the Second Circuit for FLSA collective actions:

> At step one, the district court permits a notice to be sent to potential opt-in plaintiffs if the named plaintiffs make a modest factual showing that they and others together were victims of a common policy or plan that violated the law. [Myers v. Hertz Corp.,] 624 F.[3]d [537,] [] 555 [(2d Cir. 2010)]. At step two, with the benefit of additional factual development, the district court determines whether the collective action may go forward by determining whether the opt-in plaintiffs are in fact similarly situated to the named plaintiffs. Id.

Glatt v. Fox Searchlight Pictures, Inc., 811 F.3d 528, 540 (2d Cir. 2015).

Here, as explained above in Section I.A., three of the plaintiffs — Diaz, Flowers and Daza — have claims only against HR Parking and not against the Open Road Defendants because these plaintiffs never worked at Audi Manhattan. The three remaining plaintiffs, however — that is, Fernandez, Rodriguez and Arzeno — all worked for the Open Road

Defendants on the seven-to-seven, Monday through Friday, schedule for months at a time. See, e.g., Fernandez Dep. at 34; Candiany Dep. at 19, 23–24; Arzeno Aff. ¶ 4. The Open Road Defendants have raised a common defense against them — that is, that they are not the plaintiffs' employers. See Def. Mem. at 6–21. Thus, the plaintiffs are "similarly situated" to each other.

As for defendants' arguments regarding Rule 23 class certification, these arguments are moot given that plaintiffs have not made a motion under that rule.

III.     CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment and other requests for relief (Docket # 93) are denied.

Dated: November 20, 2019

New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge